IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BARBARA COLLINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 12 C 1880 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| ) | |
| CAROLYN W. COLVIN, Acting Commissioner ) | |
| of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[2]

Barbara Collins has filed a motion seeking reversal and remand of a determination by the Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her Disability Insurance Benefits ("DIB") (docs. # 16). The Commissioner, in turn, has filed a motion seeking summary affirmance of that same determination (docs. # 19). For the reasons set forth below, the Court grants Ms. Collins's motion and denies the Commissioner's motion.

I.

On December 5, 2008, Ms. Collins filed for DIB and claimed disability based on a learning disability, hypertension, diabetes, and eczema (R. 18, 34–35, 96, 103). Ms. Collins alleged an onset date of May 21, 2007 (R. 88, 103), and the date of her last insured status is December 31, 2012 (R. 135). Her claim was first denied on March 26, 2009, and was denied again upon reconsideration on June 29, 2009 (R. 34, 35). Ms. Collins requested and was granted a hearing, which was held before an Administrative Law Judge ("ALJ") on May 21, 2010 (R. 75,

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is automatically substituted as defendant.

[2] On May 18, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (docs. ## 10, 12).

630). In a written opinion issued on October 26, 2010, the ALJ concluded that Ms. Collins was not disabled and denied her benefits (R. 18–30). The Appeals Council denied Ms. Collins's request for review of the ALJ's decision (R. 1–3), making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F. 3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. Part A sets forth the general background, followed by the medical record in Part B. Part C discusses the hearing testimony, Part D summarizes the post-hearing medical consultation, and Part E addresses the ALJ's written opinion.

## A.

Ms. Collins was born on January 17, 1958 (R. 88). She is a high school graduate (R. 101) and currently lives with her husband, daughter, and grandson (R. 111, 309, 636). Ms. Collins's most recent work experience includes over eight years as a janitor from 1998 to 2007 (R. 126–133, 638). Ms. Collins applied for DIB asserting that a learning disability, hypertension, diabetes, and eczema limited her ability to work (R. 96). Ms. Collins alleged that she suffered constant headaches, poor vision, and constant itching, and that her ailments caused her to sleep all day, require assistance bathing, and use the bathroom frequently (R. 96, 112).

## B.

Between 2007 and 2010, Ms. Collins was treated for a skin condition, diabetes, and hypertension at a series of medical facilities throughout Chicago, including the Winfield Moody Health Center and the Cook County Bureau of Health Services. From April 2007 to May 2008, Ms. Collins was treated at the Winfield Moody Health Center ("Winfield Moody") by Dr.

Timothy Long. On April 3, 2007, Dr. Long examined Ms. Collins for hypertension and diabetes mellitus. He observed that she had no medical card and so had no medications for three months, but he also noted that she complained of "no pain" (R. 239-40). On the same day, however, a podiatry report noted Ms. Collins's complaints of pain and numbness of her right foot and stiffness and tenderness in her right ankle (R. 238). On April 12, 2007, another podiatry report reflected that although Ms. Collins did not complain of "right foot/ankle. . .pain today," she reported a "sharp/dull sensation" in her right foot (R. 237). Dr. Long next examined Ms. Collins on May 1, 2007, where he reported that her blood pressure was "improved; but still high," that she was newly diagnosed with diabetes mellitus, and that she did "not have the money for meds" (R. 236). On May 3, 2007, when Ms. Collins returned for a follow-up appointment, Dr. Long noted that she had failed to pick up her medication and take it as prescribed (R. 231–32).

Ms. Collins continued to visit Dr. Long into 2008 for follow-up and medication refills (R. 193-201). On July 3, 2007, Dr. Long reported that Ms. Collins was "doing well" and had "no new issues" (R. 220). On August 7, 2007, Ms. Collins returned for a podiatry exam, which was performed by Dr. Laura Shea (R. 212). Dr. Shea found the results of Ms. Collins's vascular and neurological foot exams within normal limits, but noted her complaints of itchy red skin on her left foot and listed the new problem of tinea pedis, otherwise known as athlete's foot (*Id.*).[3]  By October 16, 2007, Dr. Long determined that Ms. Collins's hypertension and diabetes had "improved" (R. 202, 204). At her May 1, 2008 appointment, however, Dr. Long found that Ms. Collins's diabetes and hypertension conditions had both "deteriorated," she had run out of her own diabetes medication, was using her husband's medication instead, and had not regularly followed her medication routine (R. 193–96).

---

[3] Athlete's Foot, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001878/ (last visited Mar. 25, 2013).

Between November 2008 and January 2009, Ms. Collins also received medical care at the Cook County Bureau of Health Services ("Cook County") at least four times (R. 295–304). On November 7, 2008, Dr. Harry Karydes first treated Ms. Collins in the emergency department and provided her discharge instructions for nonspecific dermatitis (R. 295-96). Dr. Joerg Albrecht treated Ms. Collins at her subsequent three visits (R. 299–305). On December 2, 2008, Dr. Albrecht noted that Ms. Collins's diabetes was "completely out of control," she had run out of medication, and she could not afford the co-pay for additional medication (R. 299). Dr. Albrecht also found that she had an "unclear skin disease" and "uncontrolled" hypertension (*Id.*). He observed that she had "[h]yperkeratotic hyperpigmented plaques on the soles and palms [with] scaling, follicular hyperkeratosis eczematous changes of the face" (*Id.*). A month later, on January 2, 2009, Dr. Albrecht prescribed a series of treatments for Ms. Collins's skin condition, including ointments and medication, such as azathioprine and prednisone (R. 301). He also noted that Ms. Collins was receiving treatment for her diabetes and hypertension at a different facility (*Id.*). Finally, on January 12, 2009, Dr. Albrecht found Ms. Collins's complete blood count (CBC) test unremarkable and added a prescription for soriatine to treat her skin condition, which he considered possibly "follicular eczema," "psoriasis," or "pityriasis rubra palaris" (R. 303).

During the period in which Ms. Collins sought treatment at the Cook County Bureau of Health Services, she continued her care at Winfield Moody. On December 30, 2008, Ms. Collins saw Dr. Anthony McKitty at Winfield Moody and complained of rash, itching, and dryness (R. 191). Dr. McKitty examined her that day for hypertension, diabetes, and eczema of the whole body, finding her diabetes unchanged, but her hypertension "deteriorated" (R. 190–92). By February 24, 2009, Ms. Collins was again regularly visiting the Winfield Moody Health Center,

where Dr. McKitty treated her for dermatitis, diabetes, and hypertension (R. 363-65). While Ms. Collins complained of a rash and itching on her skin, Dr. McKitty concluded that, except for her palms, her skin condition was "much improved" (*Id.*). He also noted that her diabetes had improved, but her hypertension had deteriorated (*Id.*). Dr. McKitty's April 24, 2009 treatment notes reflect that Ms. Collins's skin condition had again "improved," but that she still complained of a rash (R. 358-60). Dr. McKitty listed her diabetes and hypertension conditions as "unchanged" on that date (*Id.*).

On June 5, 2009, Ms. Collins visited Dr. Peter Lio, a dermatologist with the Northwestern Medical Faculty Foundation, who diagnosed her skin condition as pityriasis rubra pilaris (R. 396, 479-82). Dr. Lio prescribed a series of morning and evening treatments, which included the use of specific body washes, prescription ointments, moisturizers, and the overnight use of a sauna suit (R. 396–97). At this and her three subsequent appointments with Dr. Lio, his review of symptoms lists "fatigue, chills, nausea, stuffy nose, and diarrhea, unexplained" (R. 479, 483, 487, 492). Dr. Lio also recounted that Ms. Collins's skin condition "[i]nitially began on feet, then spread to whole body. Describes redness and scaly on whole body" (R. 479, 483, 487). In his June 26, 2009 treatment notes Dr. Lio wrote, "Significant financial issues unfortunately, but now she has secured MTX so hopefully we can continue to help" (R. 490).

Following these dermatology appointments, Dr. Susana Salcedo treated Ms. Collins for many of her remaining visits to Winfield Moody in 2009 and 2010. On July 14, 2009, Dr. Salcedo noted that Ms. Collins's skin condition was improving (R. 454). Dr. Salcedo cautioned Ms. Collins, however, that she would have to begin taking insulin for her diabetes if she did not control her diet better and exercise more (R. 455). Additionally, Dr. Salcedo gave Ms. Collins a mental status exam that day, and Ms. Collins denied experiencing depression, anxiety, memory

loss, mental disturbance, suicidal ideation, hallucinations, or paranoia (*Id.*). A follow-up appointment on September 18, 2009 yielded a similar mental status exam, but on this date, Dr. Salcedo noted that Ms. Collins's hypertension was "poorly controlled" and that Ms. Collins was "very close" to requiring insulin to treat her diabetes (R. 450). Ms. Collins visited Dr. Salcedo again on October 2, 2009 for follow-up and to have Dr. Salcedo complete Ms. Collins's DIB forms (R. 442). That day, Dr. Salcedo found that while Ms. Collins's diabetes was controlled, her pityriasis rubra pilaris condition had flared (R. 442–43).

Then, in January 2010, Ms. Collins visited Winfield Moody for a diabetic ophthalmology exam with Dr. Paul Bryar. Dr. Bryar reported that Ms. Collins was happy with her distance vision and used over-the-counter reading glasses (R. 439-41). Without prescription eyewear, Ms. Collins's vision was 20/40 in her right eye and 20/50 in her left eye, and she did not have diabetic retinopathy (R. 439). After the eye exam, Ms. Collins Dr. Salcedo for follow-up visits on March 12, 2010 and April 19, 2010, where Ms. Collins reported compliance with her medication routine (R. 426–27, 436–37). At the April 19th appointment, Dr. Salcedo conducted a diabetes exam where she noted a normal exam for the left foot, cracking on the right foot, and sensory intact for both feet (R. 428). Ms. Collins did not report any pain affecting her activity level (R. 426).

In 2009, in connection with her social security application, two consulting physicians examined Ms. Collins. On March 6, 2009, consulting psychiatrist Dr. Ana A. Gil examined Ms. Collins (R. 308-11). At the exam, Ms. Collins reported that the discomfort of her eczema caused difficulty sleeping at night (R. 308). Dr. Gil reviewed Ms. Collins's history of various learning disabilities, including enrollment in special education classes from first grade through high school, noting that Ms. Collins reported that she received D and F grades ant that she "struggled

6

with school" (R. 308, 311). Dr. Gil concluded that Ms. Collins had an impairment in her ability to abstract but found no evidence of psychosis, thought process disorder, or any psychiatric disorder (*Id.*). Dr. Gil further reported that Ms. Collins's mental status examination was normal and noted that Ms. Collins would be able to handle any awarded funds without assistance (*Id.*).

On the same day, Dr. Fauzia A. Rana, an agency consulting physician, examined Ms. Collins and completed a medical source statement (R. 314–29). Dr. Rana reviewed Ms. Collins's medical records from Winfield Moody Health Center and noted that, in addition to Ms. Collins's primary claims of high blood pressure and diabetes, her skin condition was present all over her body and caused itching and burning (R. 321). Additionally, during the exam, Ms. Collins complained of feeling nervous and depressed (R. 322). Like Dr. Gil, Dr. Rana noted Ms. Collins's learning disability and consequent special education classes (R. 321). Dr. Rana recorded that Ms. Collins had uncorrected vision of 20/70 in the right eye and 20/70 in the left eye, and pinhole vision of 20/50 in the right eye and 20/40 in the left eye (R. 322). Dr. Rana found no anatomic abnormality of Ms. Collins's upper extremities and no limitation of any joint motion (R. 323). Furthermore, Ms. Collins's gait was normal (R. 324). Dr. Rana's diagnostic impressions of Ms. Collins included generalized eczema, poorly controlled high blood pressure, poorly controlled diabetes, and a learning disability with a history of anxiety and depression (*Id.*). Dr. Rana determined that Ms. Collins was able to sit, stand, walk, lift, carry, handle objects, hear, and speak without limitation and advised Ms. Collins to seek medical attention for her high blood pressure (*Id.*).

In addition to the consultative examinations, three state agency doctors reviewed Ms. Collins's records to assess her claims. First, on March 23, 2009, non-examining psychologist Tyrone Hollerauer, Psy.D., performed a psychiatric review of Ms. Collins based on field office

observations of her and Dr. Gil's consultative examination (R. 330–42). Dr. Hollerauer concluded that Ms. Collins's learning disabilities were "not severe" (R. 330). When rating Ms. Collins's functional limitations, Dr. Hollerauer found that Ms. Collins had mild difficulties maintaining concentration, persistence, or pace, and noted that she had appeared sleepy and had "drifted off a few times" during her field office observation (R. 340–42). Dr. Hollerauer stated that although Ms. Collins claimed a learning disability, he found that claim undermined by a long work history and the absence of supporting school records (R. 331).

The following day, a state agency non-examining consultant, Dr. Charles Wabner, completed a physical residual function capacity assessment of Ms. Collins and found that she could occasionally lift up to 50 pounds and frequently lift and/or carry up to 25 pounds (R. 345). According to Dr. Wabner, Ms. Collins could stand or walk for about six hours of an eight-hour workday, could sit for about six hours of an eight-hour workday, and is not limited in her ability to push or pull (*Id.*). Dr. Wabner cited Ms. Collins's poorly controlled diabetes and high blood pressure as evidence to support these limitations (*Id.*). Dr. Wabner did not note any postural, manipulative, visual, communicative, or environmental limitations (R. 346–48).

Upon Ms. Collins's April 8, 2009 request for reconsideration of her application (R. 42), another non-examining state agency consultant, Dr. David Bitzer, reviewed Ms. Collins's previous consulting examinations, additional treatment notes, and allegations of a learning disability, hypertension, diabetes, and eczema (R. 385-92). On June 20, 2009, Dr. Bitzer completed a physical residual functional capacity assessment and found no external, postural, manipulative, or visual limitations (R. 386–89). Dr. Bitzer did note that Ms. Collins should avoid concentrated exposure to wetness and chemical hazards due to her skin condition (R. 389). Dr. Bitzer found, however, that Ms. Collins's allegations at both the initial and reconsideration levels

were not credible (R. 392). Dr. Bitzer first addressed Ms. Collins's claim that she was unable to "do anything with her hands" due to her skin condition (*Id.*). Dr. Bitzer commented that the treating physician medical records did not support such a severe claim, concluding that the medical records revealed that the condition had improved between December 2008 and January 2009 (*Id.*). Finally, Dr. Bitzer concluded that there was no evidence to support Ms. Collins's alleged lifting or walking limitations (*Id.*).

## C.

At the administrative hearing, held on May 21, 2010 (R. 630), Ms. Collins and her friend Kimberly Powell testified (R. 636, 648). Ms. Collins was not represented by counsel (R. 633–34).

The ALJ informed Ms. Collins that she had a right to representation and instructed her how to find and pay for an attorney (R. 632–34). The ALJ advised Ms. Collins that the representative gets up to 25 percent of back benefits, and that the amount the representative can receive is capped (R. 633-34). Ms. Collins testified that she wished to proceed without representation because she had waited too long (R. 634).

Ms. Collins said that the last time that she was employed was in 2008, but later amended the year to 2007 when the ALJ referenced the records listing 2007 as the last year (R. 638). The ALJ then identified Ms. Collins's three primary complaints: diabetes, hypertension, and the skin condition (R. 639). Ms. Collins said that as a result of her diabetes, she has had stomach pains since 2007, but her medication has helped (R. 643). Ms. Collins denied findings of any eye-related conditions (R. 643). Ms. Collins also explained that the bottom number of her blood pressure reading (or diastolic blood pressure) was usually higher than it should be and that she also experiences dizziness (R. 644). When asked about her spelling and reading ability, Ms.

Collins stated that she had problems reading some words in the newspaper and did not understand the general idea of the articles (R. 644–45).

Regarding her skin problems, Ms. Collins testified that the skin on her hands was dry and peeling (R. 645), she could not raise one of her arms past a certain point, the arm caused her pain, and she had difficulty reaching items on tall counters as a result (R. 645–46, 648). Ms. Collins attributed all of this pain to her skin condition (R. 646). When asked about her lower extremities, Ms. Collins remarked that she would sometimes fall after walking long distances; she fell in the street one time when she tried to go shopping; she falls about twice a month; and she experienced some pain in her legs (R. 646–47). She said that she had asked for diagnostic tests on her legs but never received any (R. 646). Upon hearing this, the ALJ stated that he needed an additional internal medicine exam and a detailed residual functional capacity assessment to determine Ms. Collins's limitations in light of her skin condition (R. 647).

Ms. Powell, Ms. Collins's friend, testified next. She said that Ms. Collins would get dizzy and need to lie down for one to two hours after taking her medication, and she would not be able to stand on her legs for too long thereafter (R. 649). Following Ms. Powell's testimony, the ALJ reiterated that Ms. Collins would have to see another doctor and told Ms. Collins to be sure to bring up the problems with her legs, falling, her feet, her skin, her hands, her left arm, and "whatever problems there are that limit your abilities to move" (R. 649–50). The ALJ added that the examination was necessary because he could not render a decision just based on the information that was available at the time of the hearing (R. 650).

### D.

After the ALJ requested an additional exam and residual functional capacity assessment at Ms. Collins's hearing (R. 647, 649–50), consulting physician Dr. Sujatha Neerukonda

examined Ms. Collins on June 23, 2010 (R. 458–73). At the examination, Ms. Collins complained of diabetes, hypertension, sickle cell trait, skin lesions, and stated that for two months prior to the examination she had suffered from left shoulder pain (R. 458-59). Ms. Collins stated that she could walk, at most, seven blocks or up two flights of stairs (R. 458). Dr. Neerukonda noted Ms. Collins's all-over rash and found that her gait was normal for fifty feet (R. 459–60). Upon evaluating Ms. Collins's mental status, Dr. Neerukonda found that Ms. Collins was "appropriate, polite and cooperative" (R. 460). Dr. Neerukonda listed the following problems as his clinical impression: diabetes, hypertension, pityriasis rubra pilaris, sickle cell trait, and left shoulder arthralgia, or joint pain (R. 461).[4] A radiology report from the same day, however, revealed unremarkable findings for Ms. Collins's left shoulder (R. 474).

Dr. Neerukonda's medical source statement listed several limitations on Ms. Collins's ability to perform work-related activities on a regular and continuous basis (R. 462–67). According to Dr. Neerukonda, Ms. Collins could only occasionally lift or carry up to ten pounds (R. 462). Dr. Neerukonda also found that during a workday, Ms. Collins was limited to sitting for two hours at a time and three hours total and was limited to standing or walking for one hour at a time and two hours total (R. 463). Furthermore, Ms. Collins could never reach overhead or push or pull with her left hand and could only occasionally reach otherwise or handle with her left hand (R. 464). Dr. Neerukonda also concluded that Ms. Collins could never climb ladders, kneel, crouch, crawl, could occasionally climb stairs and stoop, and could balance frequently, or one-third to two-thirds of an eight-hour day (R. 465). Finally, in terms of environmental limitations, Dr. Neerukonda concluded that Ms. Collins should never be exposed to unprotected heights, moving mechanical parts, dusts or other irritants, extreme temperatures, and vibrations,

---

[4] *Arthralgia*, MDGuidelines.com, http://www.mdguidelines.com/arthralgia (last visited Mar. 26, 2013).

but Ms. Collins could occasionally operate a motor vehicle and be exposed to humidity and wetness (R. 466).

**E.**

On October 26, 2010, the ALJ issued a written decision denying benefits and finding Ms. Collins not disabled (R. 18-30). In evaluating Ms. Collins's claim, the ALJ applied the Act's standard five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a)(4). The process requires the ALJ to consider whether: (1) the claimant has engaged in any "substantially gainful activity" since the alleged disability onset date; (2) her impairment or combination of impairments is severe; (3) her impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) her residual functional capacity ("RFC") prevents her from performing past relevant work; and (5) her RFC prevents her from performing any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4), (b)–(f). The claimant bears the burden of proof at Steps 1 through 4, after which the burden shifts to the Commissioner at Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

At Step 1, the ALJ determined that Ms. Collins had not engaged in substantial gainful activity since her disability onset date of May 21, 2007 (R. 20). At Step 2, the ALJ found that Ms. Collins's severe impairments were hypertension, diabetes, and pityriasis rubra pilaris (R. 20). The ALJ found that Ms. Collins's non-severe impairments included her left shoulder problem, sickle cell trait, and learning disabilities (R. 20–21).

The ALJ considered the four broad functional areas, known as the "paragraph B" criteria, designated in the disability regulations for evaluating mental disorders and section 12.00C of the Listing of Impairments (R. 21). 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ concluded that

12

Ms. Collins had no limitations in the first functional area, activities of daily living, given her ability to care for her personal hygiene, do chores, independently pay bills, and independently use public transportation (R. 21). The ALJ similarly found no limitations in the area of social functioning, because of Ms. Collins's weekly church attendance and her family activities, such as going to the movies with her husband and spending time with her grandson (*Id.*). In the third functional area, relying on Dr. Gil's March 6, 2009 mental status exam, the ALJ concluded that Ms. Collins only had a mild limitation in her concentration, persistence, or pace (*Id.*). Finally, in the fourth area, the ALJ found no episodes of decompensation (*Id.*). Consequently, the ALJ deemed Ms. Collins's mental impairment non-severe (*Id.*).

At Step 3, the ALJ determined that Ms. Collins's impairments do not meet or medically equal the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1, 20 C.F.R. § 404.1520(d), 20 C.F.R. § 404.1525, and 20 C.F.R. § 404.1526. The ALJ first considered Ms. Collins's diabetes under Listing 9.08[5] and concluded that there was no evidence to support neuropathy, acidosis, or retinitis proliferans as required under 9.08A, B, and C, respectively (R. 21). Next, the ALJ found that Ms. Collins's hypertension did not meet Listing 4.00, given the lack of cardiovascular system damage or any other end organ damage (*Id.*). The ALJ then determined that Ms. Collins's pityriasis rubra pilaris did not meet Listing 8.01 because her skin condition was controlled and did not produce extensive or persistent lesions (R. 22).

The ALJ concluded that Ms. Collins had the residual functional capacity to perform a full range of work at all exertion levels but found two nonexertional limitations: Ms. Collins must avoid concentrated exposure to both wetness and hazards (R. 22). The ALJ considered Ms. Collins's claims that she was limited in her ability to work as a result of her hypertension,

---

[5] This is the Listing that was in effect at the time of the ALJ's decision.

diabetes, and learning disability (*Id.*). The ALJ concluded that, despite the evidence that Ms. Collins's diabetes and hypertension were poorly controlled, her conditions did not result in symptoms or limitations that would affect Ms. Collins's ability to work (*Id.*).

The ALJ then analyzed Ms. Collins's medical records, beginning with her diabetes diagnosis on April 3, 2007 through her June 23, 2010 consultative examination with Dr. Neerukonda (R. 22-27). The ALJ first reviewed a series treatment records from Ms. Collins's visits to the Winfield Moody Health Center between April 2007 and May 2008 (R. 22-23). The ALJ noted that at the May 1, 2007 appointment, while Ms. Collins reported frequent urination, she was generally doing well and her conditions were improving throughout the period (*Id.*). The ALJ observed, however, that Ms. Collins was failing to take her medications (R. 23).

The ALJ tracked the development of Ms. Collins's rash through her diagnosis in November 2008 and her subsequent treatments from January 2009 through July 2009 (R. 23). The ALJ noted the initial improvement of Ms. Collins's rash recorded on January 27, 2009, and the various treatments that she was prescribed throughout the treatment period. The ALJ further reviewed Ms. Collins's treatments and exam results, including: the results of mental health status screening and the warning Ms. Collins received about her diet and exercise on July 14, 2009; an examination that revealed no complaints other than her skin condition on October 2, 2009; a normal diabetic eye examination on January 19, 2010; a depression screening and physical examination on March 12, 2010; and an April 19, 2010 routine exam and diabetes foot exam (R. 24).

The ALJ next listed the findings of Ms. Collins's March 6, 2009 consulting psychiatric and physical examinations, conducted by Dr. Gil and Dr. Rana, respectively (R. 24-26). The ALJ included Dr. Gil's descriptions, notes, diagnosis, and ultimate finding that the mental status

14

exam was normal (R. 24-25). The ALJ also detailed Dr. Rana's findings and conclusion that Ms. Collins was able to physically function without limitation (R. 26). Finally, the ALJ summarized Dr. Neerukonda's consultative examination findings, including those regarding Ms. Collins's eye exam, neurological exam, and musculoskeletal exam, which was supplemented by the x-ray findings for her left shoulder (R. 26-27).

After reviewing Ms. Collins's treatment notes, consulting examinations, and state agency assessments, the ALJ concluded that the record showed few symptoms or limitations associated with Ms. Collins's hypertension or diabetes and did not include complaints of headaches, dry mouth, abdominal pain, dizziness, falling, or difficulties with prolonged walking (R. 27). In contrast to Ms. Collins's allegations of blurred vision, the record reflected a normal eye exam in January of 2010 and the lack of any allegations of vision problems at the May 2010 hearing (R. 27–28). The ALJ further noted that Ms. Collins's skin condition was "reasonably well controlled," despite Ms. Collins ending her treatment (R. 28).

The ALJ concluded that while Ms. Collins's medically determinable impairments could have reasonably caused her alleged symptoms, her statements regarding the symptoms' intensity, persistence, and limiting effects were not credible to the extent that they were inconsistent with her residual functional capacity assessment (R. 28). The ALJ analyzed the conclusions of the three state agency doctors, Dr. Hollerauer, Dr. Wabner, and Dr. Bitzer (Id.). He assigned greatest weight to the opinions of Dr. Hollerauer and Dr. Bitzer because he found that the treatment record and results of the consultative examinations supported the two opinions (Id.). Furthermore, the ALJ found that the "relatively minor findings" specified in Dr. Neerukonda's post-hearing examination report—the body rash, elevated blood pressure reading, and a minor reduction in the range of motion in Ms. Collins's left shoulder—were "wholly inconsistent" with

the magnitude of the limitations that Dr. Neerukonda listed in the completed medical source statement (R. 28). These limitations included lifting no more than ten pounds, sitting three hours in an eight-hour workday, and standing or walking for two hours in an eight-hour workday (*Id.*). Furthermore, the ALJ found that these limitations were not supported by any part of the claimant's treating record (*Id.*). The ALJ determined that Dr. Neerukonda's opinion therefore held "little weight" as it was neither consistent with nor supported by the record as a whole (R. 28).

The ALJ explained that his RFC assessment accounted for the fact that Ms. Collins had no outward signs, symptoms, or limitations associated with hypertension or diabetes and relied on Dr. Rana's March 2009 consulting assessment that Ms. Collins is able to sit, stand, walk, lift, handle, and carry objects without limitations (R. 28–29). The ALJ noted that the restriction against hazards was precautionary and reflected the symptoms sometimes associated with hypertension and diabetes (R. 29), and that the restriction against exposure to wetness reflected Ms. Collins's skin condition, which she is able to manage (*Id.*).

At Step 4, the ALJ concluded that Ms. Collins is unable to perform her past relevant work as a custodian given her skin condition and the limitation it places on her exposure to wetness (R. 29). At Step 5, the ALJ decided that a finding of "not disabled" was appropriate under section 204.00 of the Medical-Vocational Guidelines, given Ms. Collins's age, high school education, work experience, residual functional capacity, and solely nonexertional limitations (*Id.*). Consequently, the ALJ concluded that there are a significant number of jobs in the national economy that Ms. Collins could perform (*Id.*).

## III.

The standard of review of the ALJ's decision is deferential, and we will affirm the ALJ's decision if it is supported by substantial evidence. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal citations and quotations omitted). To support a decision with substantial evidence, the ALJ must build an "accurate and logical bridge" between the relevant evidence and his conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). The ALJ must address all relevant evidence, *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), but need not address every available piece of evidence and testimony to support his conclusion. *Terry*, 580 F.3d at 475.

Ms. Collins argues for reversal and remand, asserting that the ALJ erred by: (1) rejecting a consultative examination opinion without procuring additional evidence; (2) failing to adequately develop the record given that Ms. Collins was unrepresented; (3) finding Ms. Collins not fully credible; and (4) concluding that Ms. Collins had no visual limitations. Because we agree that the first two challenges (which are interrelated) warrant remand, we do not address the propriety of the ALJ's credibility or visual limitations determinations.

## A.

Ms. Collins contends that the ALJ failed to adequately develop the record given that she was unrepresented and the ALJ's rejection of the consultative examiner's opinion resulted in an incomplete record (doc. # 17: Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security ("Pl.'s Mem.") at 5-11). The right to be represented by counsel at a disability hearing is statutory, but the claimant may waive the right. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "To ensure valid waivers, ALJs must explain to *pro se* claimants

'(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees.' " *Id.* (quoting *Binion v. Shalala*, 13 F.3d 243, 244 (7th Cir.1994)); *Thompson v. Sullivan*, 933 F.2d 581, 584–85 (7th Cir. 1991). If a valid waiver is not obtained, the burden is then on the Commissioner to show that the ALJ adequately developed the record, and there is no presumption that the claimant has presented her best case before the ALJ. *Skinner*, 478 F.3d at 842.

Here, the ALJ did not obtain a valid waiver of counsel from Ms. Collins. Although the ALJ discussed the possibility of free counsel or a contingency arrangement and the limitation of fees to 25 percent of past due benefits, the ALJ failed to mention the manner in which an attorney could aid in the proceedings (R. at 632-34). In concluding his explanation of her right to counsel, the ALJ only observed, "So some people think it's a good idea to have representation, others go ahead without; it is totally your decision, not mine" (R. 634).

This terse statement did not suffice to inform Ms. Collins of the ways in which an attorney might assist her. The ALJ has a duty in all cases to develop a full and fair record but, where the right to counsel has not been effectively waived, the ALJ's obligation is heightened. Because Ms. Collins did not knowingly waive her right to counsel, the ALJ had a heightened duty to develop the record. *Skinner*, 478 F.3d at 842; *see also Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (heightened duty of ALJ to fully and fairly develop the record when claimant is *pro se*).[6] And, the Commissioner bears the burden to show that the ALJ did so. As we explain below, the Commissioner has failed to discharge that burden.

---

[6] "[W]hen there is a possibility that a claimant may be incompetent or have a mental illness, the ALJ should explain the right to counsel and the role of an attorney in the hearing in even greater detail and with greater attention toward ensuring that the claimant understands these issues." *Wiszowaty v. Astrue*, 861 F. Supp. 2d 924, 935 (N.D. Ind. 2012) (quoting *Hawwat v. Heckler*, 608 F. Supp. 106, 108 (N.D. Ill. 1984) (citing *Smith v. Sec. of Health, Educ. &*

**B.**

In order to develop the record, an ALJ may request an additional consultative examination when he does not have sufficient medical evidence to make a disability determination. 20 C.F.R. § 404.1517. If, however, an ALJ subsequently rejects an examination that he requested, he must seek out additional information or explain why the additional opinion is no longer necessary to develop the record. *See Barnett v. Barnhart*, 381 F. 3d 664, 669 (7th Cir. 2004) ("An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernible."); *Clayborne v. Astrue*, No. 06 C 6380, 2007 WL 6123191, at *6 (N.D. Ill. Nov. 9, 2007) (where a consultative examination was deemed necessary, the ALJ's finding that the exam's results were inconclusive does not release the ALJ from his obligation to develop the record).

At Ms. Collins's May 2010 hearing, following her testimony about an array of physical and mental complaints – stomach pains, reading deficiencies, limited arm mobility, arm and leg pain, falling (R. 641, 644-48) – that exceeded those previously revealed in her medical record, the ALJ stated, "with the skin condition and the falling I am going to order a [sic] internal medicine exam with their assessment, residual functional capacity detailed assessment of what you can and can't do with your skin problem" (R. 647). The ALJ reiterated his need for more evidence on these issues, declaring, "I need a doctor to check it out and give me more information. And definitely on the skin problem, just in that alone I'd want to get more" (R. 647-48). The ALJ concluded the hearing with a summary of the medical analysis he deemed necessary before he could render his decision:

---

*Welfare*, 587 F.2d 857, 860 (7th Cir.1978))). The record reflects that Ms. Collins, while not incompetent or mentally ill, has mental limitations that would suggest that the ALJ should have been more careful in making sure that Ms. Collins understood her right to counsel.

we're going to send her to a doctor . . . make sure you bring out about your legs, your falling, whatever problem you have with your feet based on the dermatology, the skin, the hands, the left arm, whatever problems there are that limit your ability to move. That's what we're interested in. But I don't think I can do [sic] just based on what I have now; I need to have some input by someone doing an examination so I can put it all into perspective. So that's what we'll do. Internal medicine, consultative evaluation with residual functional capacity . . and then when they do all of that they'll send me the report and then I'll be able to make a decision.

(R. 649–50).

We commend the ALJ's decision to seek out this additional information. Although an ALJ is not always obligated to order additional consultative examinations, an ALJ should do so if a claimant's medical evidence about an alleged impairment is insufficient. 20 C.F.R. § 404.1519a. It is also appropriate, indeed sometimes required, when "[t]here is an indication of a change in [the claimant's] condition that is likely to affect [the claimant's] ability to work, but the current severity of [the] impairment is not established." 20 C.F.R. § 404.1519a(b)(4).[7] Here, the ALJ requested the additional information for those very reasons.

As a result, Dr. Neerukonda examined Ms. Collins on June 23, 2010. Based on that examination, Dr. Neerukonda prepared an "Internal Medicine Consultative Examination for the Bureau of Disability Determination Services" report ("Examination Report") (R. 458-61), a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" ("MSS") (R. 462-68), a "Musculoskeletal System Review" ("System Review") (R. 469-72), a "Snellen

---

[7] At the time of Ms. Collins' hearing, the regulations also stated that an ALJ would obtain additional evidence if he was unable to make a determination of disability based on the current record:

> If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence under the provisions of §§ 404.1512 and 404.1519 through 404.1519h. We will request additional existing records, recontact your treating sources or any other examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information. We will consider any additional evidence we receive together with the evidence we already have.

20 C.F.R. § 404.1527(c)(3) (effective August 11, 2006 to November 11, 2010). See also 20 C.F.R. § 404.1520b (regulation currently in force that contains similar language).

Examination" report ("Snellen Report") (R. 473) and included a radiology report from the same day regarding Ms. Collins's left shoulder (R. 474).

In the ALJ's analysis of Ms. Collins's residual functional capacity, he reviewed the clinical findings in Dr. Neerukonda's Examination Report, the Snellen Examination, and the System Review to support the his conclusion that Ms. Collins could perform a full range of work at all exertional levels, with only the need to avoid exposure to wetness and hazards (R. 26-27). The ALJ, however, chose to give "little weight" to the opinions Dr. Neerukonda expressed in his MSS (R. 28). The ALJ stated that those opinions were "wholly inconsistent" with the Dr. Neerukonda's own examination findings and were "not supported in the least bit by the claimant's treating record" (Id.). The ALJ based his conclusion about the internal inconsistency of Dr. Neerukonda's opinion on the disparity between what he considered the doctor's "relatively minor" examination findings "(body rash, elevated blood pressure reading, and minor reduction in range of motion of the left shoulder)," on the one hand, and the doctor's opinion that Ms. Collins could lift no more than ten pounds, sit only three hours in an eight-hour workday, and stand and/or walk only two hours in an eight-hour workday, on the other hand (Id.).

The ALJ additionally concluded that the record as a whole did not support Dr. Neerukonda's opinions (R. 28). When considering the opinions of Ms. Collins's treating doctors, the ALJ noted that despite fluctuations in Ms. Collins's hypertension and diabetes that often resulted from poor control over her medication, Ms. Collins's had normal musculoskeletal and physical exam results, her skin condition had improved, and she was doing well overall with no complaints of pain (R. 23). The ALJ also considered Ms. Collins's physical and psychiatric examinations performed in connection with her DIB application, as well as the three assessments of state agency medical consultants (R. 28). The ALJ considered the state agency consultants'

opinions that Ms. Collins had no exertional limitations (or at least had the RFC to perform work activity at the medium activity level) and determined that these opinions were supported by both the treatment record and consulting evaluations of Dr. Rana and Dr. Gil (*Id.*).

We do not decide whether the ALJ's decision to give "little weight" to Dr. Neerukonda's opinion is supported by substantial evidence. Even assuming that were the case, a remand is in order because the rejection of Dr. Neerukonda's opinion left a void in the record. Similar to the ALJ who found a claimant's consultative examination inconclusive in *Clayborne*, the ALJ here was obligated to further develop the record in order to decide whether Ms. Collins's conditions constituted a disability. *See Clayborne*, 2007 WL 6123191, at *6. ("Once a claimant has been recommended for a consultative examination, 'inconclusive' results are not sufficient to meet the ALJ's duty to develop the record."). Once he discounted Dr. Neerukonda's opinion, the ALJ was obligated either to request an additional consultative examination or to explain why the medical opinion evidence was no longer necessary to make a decision. *Id.* Here, the ALJ did neither.

To be sure, the ALJ fairly pointed out that Dr. Neerukonda did not explain the connection between his clinical findings and his conclusions regarding Ms. Collins's functional limitations. However, once having made that observation, the proper course for the ALJ to pursue would have been to seek further explanation from Dr. Neerukonda. *See Barnett*, 381 F.3d at 669 (where clarification is necessary to develop the record, the ALJ should recontact the doctor); *see also* 20 C.F.R. § 404.1519p(b) ("If the [consultant's] report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report."). Not only did the ALJ fail to do so, but he then compounded that error by

failing to explain why he no longer considered the consulting opinion necessary to complete a record he had previously found deficient. Consequently, he both failed to fully and fairly develop the record and to draw an "accurate and logical bridge" between the evidence and his conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

Plainly, the ALJ took great care to develop the record based on the evidence supplied, and we recognize the burden imposed by requiring ALJs to seek out additional information to supplement an already long and complex medical record. In fact, because there can always be one more piece of evidence to gather, courts generally defer to the Commissioner on how much evidence to collect. *Nelms*, 553 F.3d at 1098. But, when the ALJ has already determined that the additional evidence is necessary, he must see this determination through to its natural end to adequately develop the record. This is especially true when a *pro se* claimant comes before an ALJ, *see id.*; *Million v. Astrue*, 260 Fed. App'x 918, 921 (7th Cir. 2008) (ALJ "must 'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.' " (quoting *Skinner*, 478 F.3d at 841-42)), and when the rejected opinions of the consulting examiner would support a finding of disabled status.[8] In this case, the ALJ's failure to develop the record or to explain why the need to do so no longer existed warrants remand.[9]

---

[8] Indeed, Ms. Collins argues – without contradiction by the government – that the limitations Dr. Neerukonda reported in the MSS would support a finding of disability (Pl.'s Mem. at 5).

[9] Ms. Collins, now represented by counsel, asserts as a separate argument that the ALJ did not develop the record in regard to her learning disabilities, given her *pro se* status (Pl.'s Mem. at 9–11). In remanding the case, we leave it to the ALJ to consider in the first instance whether additional development of the record is necessary on this point.

## CONCLUSION

For the reasons set forth above, we grant Ms. Collins's motion for remand (doc. # 16), and we deny the Commissioner's motion to affirm (doc. # 19). Because the ALJ did not adequately develop the record, we remand for proceedings consistent with this opinion. On remand, the ALJ should further develop the record to determine the extent and severity of Ms. Collins's impairments. We express no view as to the outcome the ALJ should reach. The case is remanded for further proceedings consistent with this ruling. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: March 27, 2013